PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Pedro A. Jimenez
Irena Goldstein

*Proposed Attorneys for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

|  |  |
|---|---|
| *In re:* | :    Chapter 11 |
|  | : |
|  | :    Case No. 19-23489 (RDD) |
| **MAXCOM USA TELECOM, INC., et al.,** | : |
|  | : |
|  | : |
| Debtors.[1] | : |

---------------------------------------------------------------X

## DECLARATION OF ERIK GONZALEZ LAUREANO IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS IN COMPLIANCE WITH LOCAL RULE 1007-2

I, Erik Gonzalez Laureano, hereby declare under penalty of perjury as follows:

1. I am the Chief Executive Officer of Maxcom USA Telecom, Inc., a company organized under the laws of the State of New York ("Maxcom USA") and the Chief Financial Officer of debtor Maxcom Telecomunicaciones, S.A.B. DE C.V. ("Maxcom Parent," and together with Maxcom USA, the "Debtors"), a company organized under the laws of Mexico and the parent of debtor Maxcom USA. I am generally familiar with the day-to-day operations, affairs, and books and records of the Debtors.

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, Maxcom USA Telecom, Inc. (7220) and Maxcom Telecomunicaciones, S.A.B. de C.V. (8KT0). The location of Debtor Maxcom Telecomunicaciones, S.A.B. de C.V.'s corporate headquarters and service address are: Guillermo González Camarena, 2000, Centro Ciudad, Santa Fé, Mexico, CDMX. The service address for Debtor Maxcom Telecom USA Inc. is c/o United Corporate Services, Inc., Ten Bank Street, Suite 560, White Plains, NY 10606.

2.      On August 19, 2019 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this

Court seeking approval of their Joint Prepackaged Chapter 11 Plan dated June 17, 2019 (as same

may be amended or modified, the "Plan"), so as to permit the restructuring of the Step-Up Senior

Notes due 2020 issued by Maxcom Parent and guaranteed by the Non-Debtors Subsidiaries (as

defined in the Plan) (the "Old Notes") on the terms set forth in the Plan.

3.      On the Petition Date, the Debtors also filed a number of motions and applications

(collectively, the "First Day Motions") in order to move towards approval and confirmation of

the Plan in a manner that will allow the Debtors to operate in Chapter 11 with minimum

disruption or loss of value.  I am familiar with the contents of each of the First Day Motions

(including the exhibits thereto), and believe that the relief sought in each of the First Day

Motions is necessary to ensure a successful restructuring of the Debtors.

4.      I submit this declaration in support of the First Day Motions pursuant to Rule

1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules") and 28 U.S.C. § 1746 (the "First Day Declaration").

Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on

my personal knowledge, information supplied to me by others at the Debtors and the Debtors'

professionals, were learned from my review of relevant documents or are my opinion based upon

my experience and knowledge of the Debtors' operations and financial condition.  I am over the

age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to

testify, I could and would testify competently to the facts set forth herein.

5.      Part I of this Declaration describes the background and business of the Debtors.

Part II describes the Debtors' prepetition capital structure and indebtedness.  Part III describes

the circumstances leading to the commencement of the chapter 11 cases and the efforts of the

Debtors to restructure the Old Notes.  Part IV sets forth the relevant facts in support of each of

the First Day Motions.  Part V contains statements and schedules providing additional

information about the Debtors, including the basis for venue in this district, as required by Local

Rule 1007-2.

**PART I**

**<u>BACKGROUND AND BUSINESS OF THE DEBTORS</u>**

**A.      Corporate History and Organizational Structure**

6.      Maxcom Parent is a limited liability public stock corporation (*sociedad anónima*

*burstátil de capital variable*) with indefinite life, organized under the laws of Mexico in 1996.[2]

Maxcom Parent is not a public reporting company in the United States pursuant to the Securities

Exchange Act of 1934.  Maxcom USA is a wholly owned subsidiary of Maxcom Parent

organized under the laws of New York in 2019.  An organizational chart illustrating the current

corporate structure of Maxcom Parent and its subsidiaries, including Maxcom USA, is attached

hereto as **<u>Exhibit A</u>**.

**B.      The Business and Assets of the Debtors**

7.      Maxcom Parent and its subsidiaries (together, the "<u>Maxcom Enterprise</u>") are

facilities-based telecommunications providers that use a "smart-build" approach to deliver "last-

mile" connectivity to enterprises, residential customers and governmental entities in Mexico.

Since its inception, the Maxcom Enterprise has targeted business, residential customers and

governmental entities that have been underserved by Teléfonos de México, S.A.B. de C.V.,

the local telecommunication incumbent, and other competing telecommunications providers.

---

[2]      Maxcon Parent was originally organized under the name "Amaritel, S.A. de C.V," but changed its name to
"Maxcom Telecommunicaciones, S.A. de C.V." on February 9, 1999.  In connection with its initial public
offering, Maxcom Parent's corporate name was changed to "Maxcom Telecommunicaiones, S.A.B. de C.V."

3

The Maxcom Enterprise provides a wide range of voice and data services on a bundled and unbundled basis, including local and long−distance voice, data, high speed, dedicated Internet access and VoIP telephony, among others.

8.    The Maxcom Enterprise operates its own telecommunications network and support infrastructure, including the critical "last mile" or customers' premise level infrastructure (modems, handsets and set-up boxes) for its residential segment, which allows it to control the quality of the user experience and adapt its service offerings to meet market demand. The Maxcom Enterprise believes that the combination of innovative, bundled offerings, competitive pricing and dedicated customer service provides value for its customers, and has allowed it to maintain 156,571 voice lines in service as of December 31, 2018.  The Maxcom Enterprise has a history of being the first providers in Mexico to introduce new services, including:

- the first commercial digital subscriber line broadband offering in 2005,

- the first "triple−play" (or cable, voice and broadband) offering to residential customers through a revenue−sharing agreement with cable television companies in 2005, and

- the first unbundled "quadruple−play" by adding mobile services to its bundled "triple−play" offering as a MVNO with Pegaso PCS, S.A. de C.V. on September 5, 2007.

- In addition, in August 2007, the Maxcom Enterprise launched paid TV services over copper network using IP, representing the first IPTV offering in Mexico.

9.    The Maxcom Enterprise operates in select metropolitan areas that offer the best growth opportunities in telecommunications because of a combination of concentrated population, low subscriber line penetration, potential expenditure in telecom services per customer and economic prosperity.  The Maxcom Enterprise currently offers services in the

4

cities of Mexico City, Puebla, Querétaro, San Luis Potosí, Guadalajara, Monterrey, Veracruz, Toluca, León, Aguascalientes, among others. The Maxcom Enterprise focuses its development efforts on a small number of large cities where it seeks to achieve strong penetration to capture operating efficiencies through a combination of network density and economies of scale. As of December 31, 2018, the Maxcom Enterprise's network encompassed 1,685 kilometers of metropolitan fiber optic cable in 16 cities and over 504 kilometers of high-quality copper loops capable of high-speed data transmission in San Luis Potosí.

10.     The Maxcom Enterprise is currently winding down its residential segment, which involves the gradual closure of residential clusters and mass disconnection of residential customers. This divestiture should be concluded by December 2019. For the second quarter ended June 30, 2019, the Maxcom Enterprise's residential segment generated approximately $1.4 million, 7% of the Maxcom Enterprise's total consolidated revenues.[3] In contrast to the residential segment, the Maxcom Enterprise recently reactivated its wholesale business this year. The revenue in this segment was approximately $7 million, more than 2,000% as compared to the same period in 2018.[4] The wholesale segment generated approximately 35% of the Maxcom Enterprise's revenues for the quarter ended June 30, 2019.

---

[3]     The Debtors report their financial results on a consolidated basis. Accordingly, references herein to the Debtors' financial results include Maxcom Parent and its subsidiaries' financial results.

[4]     Unless otherwise indicated, the exchange rate used herein is the buying rate for pesos reported by the Banco de Mexico on June 30, 2019 of Ps. 19.1685 per $1.00.

## PART II

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS

11.     The Debtors' largest financial indebtedness is the amount that it owes on account of the Old Notes.  As of the Petition Date, the amount outstanding on the Old Notes was $103,378,674, plus estimated accrued interest through August 18, 2019 of $5.6 million.  The Old Notes are secured by the Debtors' fixed assets, but not the Debtors' cash or accounts receivable.

12.     Interest payments under the Old Notes are made semi-annually on June 15 and December 15 (or, if a non-Business Day, the next succeeding Business Day).  In light of the Debtors' liquidity constraints and the progress made on negotiations concerning a restructuring (discussed below), Maxcom Parent elected not to make the interest payment of $4.1 million due on June 15, 2019 in order to conserve cash for operational and restructuring expenses.  Maxcom Parent advised holders of the Old Notes that upon confirmation of the Plan, it would pay holders of the Old Notes accrued interest on the Old Notes through the Effective Date of the Plan.

13.     Maxcom Parent is also indebted in the approximate amount of $29 million under certain leases and bank loans.  The vast majority of such liabilities relate to leases for property and telecom equipment.  Pursuant to changes in Mexican accounting standards, effective January 2019, the Maxcom Parent is required to reflect on its balance sheet the net present value of its present and future obligations under such leases.  Prior to such accounting change, these liabilities would not have been reflected on the balance sheet.

14.     The remaining amount of the approximate $29 million of non-Old Notes liabilities is the approximately $1.84 million owed to Banco Nacional de Comercio Exterior, S. N. C., Banca de Desarrollo ("Bancomext," and the Bancomext loan to Maxcom Parent, the "Bancomext Loan").

15.     The Bancomext Loan is secured by a pledge of funds in a trust account (the

"Trust Account"), on deposit at BBVA Bancomer, S.A., Institución de Banca Múltiple, Grupo

Financiero BBVA Bancomer ("BBVA").  Banco Mercantil del Norte ("Banorte") is the trustee

of the Trust Account.  The funds on deposit in the Trust Account are proceeds of accounts

receivable owed by certain Maxcom Parent customers.  Such customers send their payments

directly to a Maxcom Parent account also at BBVA (having the last four digits 9809).[5]  No other

funds are commingled in such BBVA account.  Banorte has access to BBVA Account (9809)

and transfers funds on an almost daily basis to the Trust Account.  After the monthly debt service

is made to Bancomext, Banorte transfers the surplus remaining in the Trust Account to Maxcom

Parent's account at Banco Santander (México) S.A. ("Santander").  If, during the first 15 days of

any month, the balance in the BBVA Account (9809) falls below a coverage ratio of 2.5 times

the monthly debt service, Banorte directs Maxcom Parent to wire funds from such Santander

account to the Trust Account to ensure that the amounts on deposit are sufficient to satisfy the

coverage ratio.  Monthly debt service on the Bancomext Loan decreases every month because

principal has been re-paid.  As of August 15, 2019, future monthly debt payments will average

approximately $139,000.  There is currently $454,942.13 in the Trust Account.[6]

16.     Claims arising under such bank loans and leases, and all other amounts incurred

in the ordinary course of the Debtors' business, are unimpaired under the Plan.

---

[5]     A chart demonstrating the flow of funds among Maxcom Parent's bank accounts is annexed to the Cash
Management Motion (defined below) as Exhibit A.

[6]     Calculated by using the buying rate for pesos reported by the Banco de Mexico as of August 16, 2019 in the
amount of Ps. 19.5763 per $1.00.

### A. **The 2013 Restructuring**

17.     The Old Notes were issued, in the aggregate principal amount of $180.4 million, pursuant to a pre-packaged plan of reorganization confirmed by the United States Bankruptcy Court for the District of Delaware on September 10, 2013 (the "2013 Plan").  The Old Notes are governed by an indenture, dated as of October 11, 2013, among Maxcom, the guarantors named therein, Deutsche Bank Trust Company Americas, as indenture trustee, and Deutsche Bank Luxembourg, S.A. as Luxembourg sub-paying agent and transfer agent (the "Old Notes Indenture").

18.     The 2013 Plan embodied a restructuring and support agreement among Maxcom Parent, Ventura Capital Privado, S.A. de C.V. ("Ventura Capital"), and an ad hoc group of entities that held Maxcom Parent's 11% Senior Notes due 2014 (the "2014 Senior Notes"). Under the 2013 Plan, the 2014 Senior Notes were extinguished and the holders of the 2014 Senior Notes received on account of claims arising from the 2014 Senior Notes, (a) the Old Notes, (b) cash in the amount of unpaid interest accrued on the 2014 Senior Notes during certain specified periods and (c) the rights to purchase equity that was unsubscribed by Maxcom Parent's then current equity holders.  Under the 2013 Plan, the only creditors of Maxcom Parent and its affiliated debtors that were entitled to vote on the 2013 Plan were the holders of the 2014 Senior Notes; the remaining classes of claims and equity interests were unimpaired.

19.     On September 27, 2013, a group of investors, represented by Ventura Capital, completed an equity tender offer, acting through a trust held by Banco Invex, S.A. Institución de Banca Múltiple, Invex Grupo Financiero, a banking institution organized and existing under the laws of the United Mexican States.  As part of this transaction, the Ventura Capital investors became Maxcom Parent's principal shareholders.

20.    Pursuant to the terms of the Old Notes Indenture, Maxcom Parent used 50% of the capital contribution made by the Ventura Capital investors to make an offer to repurchase the Old Notes, but only to the extent that such capital contribution exceeded $5 million, at a price equal to 85% of the principal amount of the Old Notes, in cash.  This repurchase offer was initiated on November 8, 2013 and consummated on December 12, 2013, resulting in the purchase and payment of $2.5 million to investors who validly tendered their Old Notes.  During the foregoing repurchase offer, some of the holders of the Old Notes exercised their equity purchase rights issued under the 2013 Plan, and thereby exchanged their Old Notes totaling $1.8 million at book value, for 22,655,679 Series "A" common stock shares.  The rest of the equity purchase rights held by the holders of the Old Notes expired on their own terms in December 2013.[7]

**B. The Debtors' Current Financial Condition.**

21.    The Debtors' negative cash flows have limited its ability to invest in its operations by replacing or upgrading its infrastructure and technologies.  In this regard, Maxcom Parent incurred losses of $4.9 million for the three months ended June 30, 2019, as compared to losses of $2.9 million for the three months ended June 30, 2018, and losses of $16 million for the year ended December 31, 2018, compared to losses of $.8 million for the year ended December 31, 2017 and losses of $102.7 million recorded in 2016.[8]

22.    Further, Maxcom Parent's comprehensive cost of financing increased to approximately $11.2 million in 2018 from $1.1 million in 2017.  This increase reflects the step-up interest rate of the Old Notes to 8% beginning in the second half of 2018, compared to 7% for

---

[7]    In April 2017, Maxcom Parent repurchased additional Old Notes pursuant to a repurchase offer.  The principal amount of the Old Notes ($103,367,674) is net of such repurchases.

[8]    Maxcom Parent ensured that the infrastructure remained operational, despite such losses, through equity contributions made by its shareholders.

the first half of 2018 and all of 2017, as well as decreases in interest income, foreign currency

rates and valuation effects of financial instruments.  The Debtors' net revenues have also

declined, in part because of the decrease in its residential services revenue.  The Debtors' net

revenues derived from its commercial revenues have increased and constitute the core source of

profitability in the future.

23.     The Debtors' business is capital intensive.  It has historically met its working

capital and capital expenditure requirements through its various debt arrangements, vendor

financings and the sale of equity to investors.

24.     In order to expand its network and strengthen its market share, the Debtors require

additional capital.  But, the Old Notes Indenture prohibits Maxcom Parent from incurring

additional indebtedness (other than permitted indebtedness) unless certain leverage coverage

ratios are satisfied, and the increased interest burden under the Old Notes seriously constrains the

Debtors' ability to take the actions required under its business plan to strengthen and expand

their operations.

# PART III

## CIRCUMSTANCES LEADING TO COMMENCEMENT
## OF THESE CHAPTER 11 CASES

25.     As stated above, Maxcom Parent is currently suffering under the high debt load of

the Old Notes, which it has been unable to refinance due to issues with its business, including its

inability to continue modernizing its infrastructure.  While the Maxcom Enterprise has executed

several non-strategic asset sales in order to raise cash (*e.g.*, sales of contracts with select

residential clients, certain transmission towers, among other transactions), because of external

events outside of its control that arose after the Old Notes were issued, Maxcom Parent will be

unable to satisfy the Old Notes when they mature in 2020.

26.     For example, in 2014, Mexico enacted certain telecommunications reforms that

(a) prohibit Maxcom Enterprise (and other telecommunication companies) from charging certain

long-distance fees and (b) establish price restrictions on all telephone calls in the country.  These

restrictions severely affected the profitability of that business segment.  Further, from 2013 to

date, the value of the Mexican Peso, as compared to the U.S., has decreased by 53%.  Because of

such devaluation, Maxcom Parent's repurchase of the $74.3 million in principal amount of the

Old Notes did not decrease the amount that Maxcom Parent's books and records reflect is owed

to the holders of the Old Notes given that Maxcom Enterprise's revenues are mostly in Mexican

Pesos.  In other words, while the amount that Maxcom Parent owes on account of the Old Notes

has decreased in U.S. Dollars, because the majority of Maxcom Enterprise's revenues are in

Mexican Pesos and the Old Notes are denominated in U.S. Dollars, Maxcom Parent's liability on

account of the Old Notes remains roughly the same on its books and records.

27.     Moreover, the majority of Maxcom Enterprise's residential segment operates

through a copper network that was sufficient at the time that Maxcom Enterprise acquired that

business, but as technology advanced, rendered Maxcom Enterprise unable to compete against leaders in the telecommunications business who invested hundreds of millions of dollars to upgrade their systems to fiber networks.[9]  It was for these reasons that the Maxcom Enterprise determined to exit out of the residential segment.

28.     As the result of these disruptions, Maxcom Enterprise's reported total revenues of $19.085 million during the second quarter ended June 30, 2019, 24% less than the revenues generated in the second quarter of 2018.  In addition, the Debtors reported an operating loss of approximately $2.3 million and a net income loss of $4.8 million for the quarter ended on June 30, 2019 as compared to a net income loss of approximately $2.9 million for the period ended on June 30, 2018.  For the first six months of 2019, the operating loss was $3.9 million.

**A.     Exchange Offer**

29.     Because Maxcom Parent needs relief from its debt burden in order to remain competitive, it began discussions with several holders of its Old Notes regarding a restructuring of the Old Notes that would extend the maturity of the Old Notes and reduce Maxcom Parent's overall debt and interest burden.

30.     Thereafter, on June 17, 2019, Maxcom Parent commenced an offer to eligible holders[10] of the Old Notes to exchange the Old Notes (the "Exchange Offer") for (a) new 8.00% senior secured notes due 2024 (the "Senior Notes") and (b) junior payment-in-kind notes (the "Junior PIK Notes" and together with the Senior Notes, the "New Notes").  As set forth above, the outstanding principal amount of the Old Notes is $103,378,674.  The maximum aggregate

---

[9]     Maxcom Parent, nevertheless, made approximately $150 million of capital investments (calculated using the exchange rate effective as of June 30, 2019) in its infrastructure since 2013.  In 2014-2015, these investments geared towards the residential and public telephone segments.  Later investments focused on strengthening and updating the network for its commercial customers.

[10]    "Eligible holders" are holders of the Old Notes who are persons other than U.S. Persons (as defined in Regulation S under the U.S. Securities Act of 1933, as amended), outside the United States.

principal amounts of the Senior Notes and the Junior PIK Notes are $56,858,270 and

$10,337,867, respectively.[11]  In addition to the Senior Notes and the Junior PIK Notes, eligible

holders that tendered their Old Notes were entitled to share *pro rata* in a Cash Payment of $100

for each $1,000 of the principal amount of the Old Notes and Cash in the amount of interest

accrued on the Old Notes until consummation of the Exchange Offer.  In addition, holders of the

Old Notes that tendered their Old Notes on or before August 14, 2019, are also entitled to a

distribution of an extra $10 for each $1,000 in principal amount of the Old Notes tendered.  The

cash consideration is funded, in part, by certain of Maxcom Parent's shareholders who have

committed to inject approximately $15 million of new equity capital into Maxcom Parent (the

"Shareholder Contribution Amount") upon the successful consummation of the Exchange Offer

or the Plan.[12]  The Shareholder Contribution Amount will also inject additional liquidity into the

Debtors.

31.     To assist it in connection with the Exchange Offer, consent solicitation and the

Plan Solicitation (defined below), the Debtors retained the services of Prime Clerk, LLC ("Prime

Clerk").

32.     After announcing the Exchange Offer, Maxcom Parent continued its talks with

certain holders of the Old Notes, and thereafter, extended the deadline for tendering the Old

Notes and improved the terms of the Junior PIK Notes by (i) changing the applicable currency

from Mexican pesos to U.S. dollars, (ii) increasing the cash payout on the Junior PIK Notes via a

---

[11]  In connection with the Exchange Offer, Maxcom also commenced a consent solicitation with respect to certain proposed amendments to the Old Notes Indenture.

[12]  The Shareholder Contribution Amount is $300 million pesos.  Accordingly, the exact Shareholder Contribution Amount in U.S. Dollars is dependent upon the exchange rate on the Effective Date of the Plan.

greater sharing of the equity upside in certain circumstances, and (iii) removing the Debtors'
optional redemption rights.

### B.    Plan Solicitation

33.    Concurrently with the Exchange Offer, the Debtors solicited votes from all
holders of the Old Notes to approve the Plan (the "Plan Solicitation") that would effectuate the
financial restructuring, *i.e.,* the exchange of the Old Notes for the New Notes and certain cash
consideration, on essentially the same terms as the Exchange offer.

### C.    The Plan is Accepted

34.    On August 15, 2019, Maxcom Parent terminated the Exchange Offer because the
requisite number of eligible holders did not tender their Old Notes and determined to file and
prosecute the Plan.  As set forth in the certification of Prime Clerk, 118 ballots were submitted
by holders of the Old Notes (the only creditors eligible to vote on the Plan).  Of those that voted,
84.75% of the holders of Old Notes in number, holding 66.73% of principal amount of the Old
Notes of the Holders that voted, voted to accept the Plan.

35.    Contemporaneously with the filing of this First Day Declaration, the Debtors filed
the Solicitation and Offering Memorandum and Consent Solicitation Statement Relating to the
Joint Prepackaged Chapter 11 Plan of the Debtors (as modified, amended, or supplemented from
time to time, the "Disclosure Statement") and the Joint Prepackaged Plan (the "Plan"), and a
motion seeking approval of the adequacy of the Disclosure Statement, approval of the
Solicitation Package and confirmation of the Plan (the "Scheduling Motion," and the proposed
order in respect thereof, the "Scheduling Order").

### D.    Discussions With Certain Holders of Old Notes

36.     Prior to the expiration of the Voting Deadline on the Plan, Maxcom Parent was contacted by Cicerone Advisors LLC ("Cicerone"), as financial advisor to three holders of the Old Notes, Moneda Asset Management, Megeve Investments and UBS Financial Services, Inc. (acting as personal banker for certain customers holding the Old Notes), who claimed that they collectively hold approximately 30% of Old Notes.[13]   Cicerone further advised that the three parties were not prepared to support the restructuring of the Old Notes on the terms proposed by the Debtors, but they were prepared to provide Maxcom Parent with a restructuring proposal for the Old Notes if, and only if, the Debtors paid the June 15, 2019 interest coupon.   While the Debtors were not in a position to make the June 15 interest payment, they welcomed the opportunity to engage with these parties to determine whether they would ultimately support the restructuring of the Old Notes, since their support (given the amount of Old Notes they allege to hold) could potentially mean that the Debtors would not have to resort to Chapter 11 in order to restructure the Old Notes.

37.     Beginning on or around August 1, 2019, Maxcom Parent met with Cicerone (without the three Old Notes holders) but Cicerone was not prepared to provide a proposal to Maxcom Parent.   Shortly before the expiration of the Voting Deadline, on August 12, 2019, Cicerone sent a letter to Maxcom Parent to reiterate the three holders' desire to provide a restructuring proposal to the Debtors, but that before they would do so, Maxcom Parent would have to agree to certain confidentiality restrictions and to pay the fees and expenses of the financial and legal advisors of such holders.

---

[13]    In accordance with Local Rule 1007-2(a)(3), the names and addresses of the members of the aforementioned holders of the Old Notes and their professionals are set forth on Schedule 1 hereto.

38.     Ultimately, the support of these three holders became unnecessary as the Debtors received sufficient support for the Plan to permit the Debtors to satisfy section 1126(c) of the Bankruptcy Code and move forward with confirmation of the Plan.  Notwithstanding whatever terms these holders intended to propose to the Debtors to restructure the Old Notes, the Debtors believe that the Plan represents the best prospect for a successful restructuring of the Debtors and in a manner designed to provide the highest possible recovery to holders of Old Notes under the circumstances.  In light of these circumstances, the Debtors believe that confirmation of the Plan is in the best interests of holders of the Old Notes, the only class of claims impaired under the Plan.

## PART IV

### FIRST DAY MOTIONS AND APPLICATIONS

39.     The Debtors have filed or will file a number of Motions (the "First Day Motions") seeking various forms of relief designed to facilitate approval of the Plan on an expeditious basis and a successful restructuring of the Debtors.  I have reviewed each of the First Day Motions, including the exhibits thereto.  I believe that the Debtors have satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtors, their estates, as well as that of their creditors and other parties in interest.  Each of the First Day Motions is summarized below.

40.     **Joint Administration Motion**.  The Debtors filed a motion seeking entry of an order directing the joint administration and procedural consolidation of the related Chapter 11 cases of the Debtors (the "Joint Administration Motion").  Specifically, the Debtors request that the Court maintain one file and docket for the Debtors' jointly administered cases under the case of Maxcom USA Telecom, Inc. and that the cases be administered under a consolidated caption.

Further, the Debtors request that an entry be made on the docket of Maxcom Parent's case to reflect the joint administration of these chapter 11 cases.

41.     Many of the motions, hearings, and orders in these chapter 11 cases will affect both Debtors.  The entry of an order direction joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Further, joint administration will allow the Office of the United States Trustee for the Southern District of New York and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Parties in interest will not be harmed by the relief requested, but instead, will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

42.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruptions.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Joint Administration Motion.

43.     **Scheduling and Solicitation Procedures Motion**.  The Debtors seek entry of an order (a) scheduling the hearing to consider (i) the adequacy of the disclosure in the Disclosure Statement and the prepetition solicitation procedures used in connection with the prepetition solicitation of the holders of the Old Notes to vote to accept or reject the Plan and (ii) confirmation of the Plan (the "Confirmation Hearing"); (b) establishing a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan; (c) approving the form and manner of notice of the Confirmation Hearing and commencement of the chapter 11 cases; and (d) certain related relief (the "Plan Motion").  The Debtors will also request that after appropriate notice and the Confirmation Hearing, that the Court enter an order confirming the

Plan, which among other things, (a) approves the process used to solicit votes on the Plan, (b)

approves the adequacy of the Disclosure Statement and (c) confirms the Plan.

44.     As set forth in the Plan Motion, the Debtors propose that the Confirmation

Hearing be scheduled for September 9, 2019, that objections to the adequacy of the Disclosure

Statement and confirmation to the Plan be filed by August 28, 2019, and that replies to any such

objections be due by September 4, 2019.  The Debtors will also file the supplement to the Plan

on September 4, 2019.  The Debtors believe that this timeline is reasonable, particularly given

the fact that the holders of Old Notes will have known the terms of the Plan for approximately 72

days by the time objections are due, and were aware that, if the Exchange Offer were not

consummated, the Debtors would promptly seek relief under the Bankruptcy Code.  Further, (a)

given the delicacy of Maxcom Parent's current negotiations with regulators, (b) to ensure that the

Debtors' creditors do not take action against the Debtors or their Mexican affiliates in Mexico,

(c) to bolster the morale of Maxcom Enterprise employees and (d) to prevent competitors of

Maxcom Enterprise from taking advantage of the Chapter 11 filings, it is imperative that the

Debtors exit bankruptcy as quickly as possible.

45.     Based on my conversation with the Debtors' advisors, I respectfully submit that

the relief sought in the Plan Motion is appropriate under the circumstances present here.

46.     **Cash Management Motion**.  The Debtors seek entry of an order (a) authorizing

the Debtors to (i) continue the use of their existing cash management system and (ii) maintain

their existing bank accounts and business firms, (b) granting administrative priority status to

postpetition intercompany claims, (c) authorizing the Debtors continued performance under

intercompany transactions and historical practices, and (d) granting an extension of time for the

Debtors to comply with section 345(b) of the Bankruptcy Code through and including October 18, 2019.

47.     To facilitate the efficient operation of their business, in the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, transfer and disburse funds generated by their operations (including the Bank Accounts (defined below), the Investment Practices, the Intercompany Transactions (each as defined herein), and all other cash management and funds-processing activities and arrangements utilized by the Debtors (the "Cash Management System").   The Cash Management System facilitates the Debtors' cash forecasting and reporting, monitoring the collection and disbursement of funds, maintenance of current and accurate accounting records for all cash transactions, and administration of approximately 23 bank accounts (collectively, the "Bank Accounts") maintained at various banks (the "Banks").

48.     The Cash Management System is similar to those commonly employed by businesses comparable to the Debtors in economic scope and geographic reach.  Indeed, large, complex businesses use such systems because of the numerous benefits provided, including the ability to quickly and easily locate and trace funds, which allows Maxcom Parent to control corporate funds, ensure cash availability to the Debtors and the Non-Debtor Subsidiaries of Maxcom Parent in their respective regions, and reduce administrative expenses by facilitating the movement of funds.  Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations.

49.     The Debtors' financial personnel and members of their accounting department located at Maxcom Parent's offices in Mexico City, Mexico, administer the Cash Management

System.  The Cash Management System is comprised of the Bank Accounts as well as the

Debtors' on-site cash and funds processing activities.

50.     The Debtors utilize the Bank Accounts to centrally manage deposited cash.  The

Bank Accounts serve specific functions and include the following accounts: collection accounts

(collectively, the "Collection Accounts") for cash, check, and credit and debit card receipts as

well as electronic funds transfers ("EFTs"); a concentration account(the "Concentration

Account"); disbursement accounts to make ordinary payments to fund operating expenses,

including intercompany transfers to several of the Debtors' non-debtor affiliates for payroll and

lease expenses, as well as payments to vendors and other third parties with whom the Debtors do

business (collectively, the "Disbursement Accounts"); and investment accounts (collectively, the

"Investment Accounts").

51.     Funds generally flow through the Cash Management System in the following

way:

a.      **Receipts**.  After daily receipts have been collected and accounted for,
        Maxcom Parent prepares cash and check deposits.  These deposits,
        together with any credit card charges via automated clearing house direct
        deposits ("ACH Payments") and EFTs are made to the collection
        Accounts.  Receipts deposited into the Collection Accounts are swept on a
        daily basis s into the Concentration Account.

b.      **Disbursements**.  Disbursements, as described above, for intercompany
        transfers to cover payroll and lease related obligations, as well as
        payments to cover vendor invoices and other obligations incurred in the
        ordinary course of business are transferred from the Concentration
        Account to the appropriate third parties or to Disbursement Accounts on
        an as-needed basis.

c.      **Excess Cash from Operations.**  As described above, Maxcom Parent
        deposits receipts into the Collection Accounts and transfers cash from
        ordinary course operations into the Concentration Account.  From time to
        time, the Concentration Account (which does not earn interest)
        accumulates excess cash.  Maxcom Parent historically has transferred
        certain excess cash from the Concentration Account into the Investment

Accounts in order to make overnight investments.  Funds are transferred back from the Investment Accounts to the Concentration Account as needed.

52.     In the ordinary course of business, the Debtors conduct transactions by debit, wire, or ACH Payments and other similar methods.  In addition, customer payments are received through ACH Payments or wire transfer.  In fact, the Debtors are required by certain foreign and domestic taxing authorities to submit tax payments electronically through wire or ACH Payments, and failure to do so may result in the imposition of penalties.

53.     In addition, in the ordinary course of business, Maxcom Parent incurs certain service charges and other fees, costs, and expenses (collectively, the "Fees") related to the Cash Management System.  For instance, the Banks charge and Maxcom Parent pays, honors, or allows the deduction from appropriate Bank Accounts, certain Fees related to the Bank Accounts (the "Bank Fees"); Maxcom Parent also incurs certain Fees related to armored-car or other transport of cash.

54.     As part of this Cash Management System, Maxcom Parent utilizes numerous preprinted business forms and digitally generated and bank-certified graphic overlays (the "Business Forms") in the ordinary course of business.  The Debtors also maintain books and records to document, among other things, their profits and expenses (collectively, the "Books and Records").

55.     As described in the Cash Management Motion, the Debtors' business is heavily dependent on the services that the Non-Debtor Subsidiaries provide, as well as transactions among such subsidiaries that give rise to intercompany claims (the "Intercompany Transactions").[14]  For example, Maxcom Parent transfers funds bi-monthly to certain Non-

---

[14]    Because the Debtors historically maintained Intercompany Transactions, and such arrangements are common among enterprises similar to those of the Debtors, the Debtors believe the Intercompany Transactions are

Debtor Subsidiaries for the payroll and employee benefit obligations that those entities incur for employees who support the Debtors' operations.  In addition, the Intercompany Transactions include payments that Maxcom Parent makes to the Non-Debtor Subsidiaries under real property and infrastructure leases that it acquires or enters into on behalf of Maxcom Parent's customers. The Intercompany Transactions total approximately $1.5 million per month.  Absent these Intercompany Transactions, the Debtors would not be able to continue operating and their ability to successfully reorganize would be in jeopardy.[15]

56.     The Debtors maintain records of their Intercompany Transactions, including fund transfers, and thus can ascertain, trace, and account for Intercompany Transactions.  As a result of such Intercompany Transactions, a receivable is entered on the general ledger for the Non-Debtor Subsidiary that rendered the good or service for the benefit of Maxcom Parent, and a corresponding liability is posted on Maxcom Parent's general ledger to account for the amount that Maxcom Parent owes for such good or service (the "Intercompany Claims").  Maxcom Parent reconciles all Intercompany Transactions on a monthly basis and will continue to maintain records and appropriately reconcile all Intercompany Transactions postpetition.

57.     As a result of the Intercompany Transactions, at any given time, including as of the Petition Date, Maxcom Parent owes certain amounts to the Non-Debtor Subsidiaries on account of Intercompany Claims.  Given the importance to the Maxcom Enterprises business of the relationship among Maxcom Parent and its affiliates, the Debtors seek authority to honor all

---

ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to continue such arrangements on a postpetition basis.

[15]   The Cash Management Motion provides an illustration of the Debtors' typical Intercompany Transactions.  The relief requested therein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions specifically described in the Motion.  To the extent that there are any outstanding prepetition transactions related to Intercompany Transactions not described in this Motion, the Debtors, in an abundance of caution, seek authority to continue such transactions.

prepetition Intercompany Claims and continue the Intercompany Transactions in the ordinary course of business.

58.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

59.     **Unimpaired Claims Motion**.  The Debtors will file a Motion Pursuant to 11 U.S.C. §§ 105, 363 and 503 and Fed. R. Bankr. P. 6003 and 6004 for Entry of an Order Authorizing the Debtors to Pay Unimpaired Claims in the Ordinary Course of Business (the "Unimpaired Claims Motion").  In the Unimpaired Claims Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to pay the holders of ordinary course prepetition trade claims and other obligations in accordance with prepetition practice.  The Debtors incur obligations to various creditors that provide the Debtors with a variety of goods and services including telecommunication, carriers, shippers and warehousemen, real estate and equipment lessors, utilities, and consultants and other ordinary course professionals, and other goods and services that are necessary for the continued operation of the Debtors' business.  The Debtors estimate that, as of the Petition Date, there are approximately $5.9 million of undisputed Unimpaired Claims, of which  the Debtors seek authority to satisfy approximately $ 2 million of Unimpaired Claims that will come due between the Petition Date and the date of the hearing to consider confirmation of the Plan.  None of the payments requested under the Unimpaired Claims Motion, other than payments in the ordinary course wages, will be made to insiders of the Debtors.

60.    In addition, the Debtors seek approval to continue the repayment of the amounts owed to Bancomext through the trust mechanism outlined above.  The Debtors believe that any disruption to the repayment of the amounts owed to Bancomext would be detrimental to their reorganization prospects, and such disruption is not warranted given that the Debtors' projections contemplate the continuation of such payments.

61.    I believe that delaying payment of unimpaired ordinary course obligations beyond normal practices could undermine the "business as usual" message that is a key term of these prepackaged chapter 11 cases.  Without the relief requested in the Unimpaired Claims Motion, it is likely that the Debtors' providers of goods and services holding outstanding prepetition claims will refuse to continue to provide goods and services to the Debtors, which will in turn have a material negative impact on the Debtors' ability to service customers.  Furthermore, absent the relief requested in the Unimpaired Claims Motion, some vendors will likely refuse to continue to operate under the Debtors' current trade terms, undermining the Debtors' operations at this critical juncture and resulting in a liquidity crisis and, short of that, the loss of favorable payment terms when negotiating upcoming contract renewals and future orders with important vendors.

62.    While I understand that the Plan contemplates paying such ordinary course obligations in full, many of the Debtors' creditors are located in Mexico and are unfamiliar with the Bankruptcy Code, or what the fact that their claims are left unimpaired under the Plan means. For the Debtors it is a timing issue.  It is more important to pay creditors the amounts they are owed when due, as opposed to delaying payment until consummation of the Plan to ensure that the Debtors' creditors located outside of the United States do not take action against the Maxcom Enterprise.  Accordingly, the relief requested in the Unimpaired Claims Motion is necessary to avoid immediate and irreparable harm.

63.     I believe that payment of the unimpaired claims will not create an imbalance of the Debtors' cash flows because many of these obligations have customary payment terms and will not be immediately payable, nor will payment terms be accelerated. Additionally, cash held by the Debtors and the cash generated in the ordinary course of business will provide sufficient liquidity to pay the unimpaired claims in accordance with prepetition practice.

64.     I believe that the relief requested in the Unimpaired Claim Motion is in the best interests of the Debtors' estates, their creditors, and all parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should grant the Unimpaired Claim Motion.

65.     **Taxes and Fees Motion**. The Debtors will also file a Motion for Entry of an Order Authorizing the Debtors to Remit and Pay Certain Taxes and Fees (the "Taxes and Fees Motion") under which the Debtors seek an order authorizing, but not directing, the Debtors to pay certain Taxes and Fees (each as defined below) that arise in the ordinary course of the Debtors' business, without regard to whether such obligations accrued or arose prior to or after the Petition Date, without accelerating payments.

66.     In the ordinary course of business, the Debtors: (a) incur and collect various taxes in both Mexico and the United States, including without limitation, income, excise, withholding and value-added taxes, which accrue on a monthly, quarterly, and/or annual basis (collectively, the "Taxes"); (b) incur various licensing and regulatory fees, assessments, and other similar charges necessary to operate their business (collectively, the "Fees"); and (c) remit such Taxes and Fees to various taxing, licensing, and other governmental authorities (collectively, the "Authorities"). As of the Petition Date, the Debtors are current with respect to the payment of Fees. The Debtors estimate that approximately $55,000 per month in Taxes are paid in the

ordinary course, and as of the Petition Date, the Debtors owe approximately $35,000 of accrued

but unpaid Taxes, some of which may be due within the first 21 days of these chapter 11 cases.[16]

67.     Significantly, all prepetition claims other than the Old Notes, including those

arising on account of Taxes and Fees, are unimpaired under the terms of the Plan, which has

already obtained requisite votes for confirmation.  *See* Plan Art. II, ¶ 2.3 (providing for treatment

of "Priority Tax Claims"); *see also id.* Art. II, ¶ 2.1 ("Administrative Claims" will be paid in full

in cash or paid in the ordinary course of business; *id.* Art. III, ¶ 3.2 (providing that all "Other

Secured Claim", "Other Priority Claims" and "General Unsecured Claims" are not impaired).

Accordingly, the relief requested in the Taxes and Fees Motion merely expedites the treatment of

the Taxes and Fees obligations that would otherwise occur at a later date under the Plan, thereby

avoiding unnecessary harm to the Debtors' business.

68.     It is my understanding that the Debtors' failure to pay the Taxes and Fees could

adversely affect the Debtors' business operations because the Authorities could suspend the

Debtors' operations, file liens or seek to lift the automatic stay.  In addition, certain Authorities

may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which

undoubtedly would distract those key personnel from their day-to-day duties as well as in

connection with the restructuring.

69.     I believe that the relief requested in the Taxes and Fees Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Court should grant the Taxes and Fees

Motion.

---

[16]    Accrued for period from August 1 to August 19, 2019 (on a pro-rated basis).

70.     **Insurance Motion**.  The Debtors filed a Motion for Entry of an Order

Authorizing the Debtors to Continue Prepetition Insurance and Surety Bond Coverage and

Obtain New Coverage (the "Insurance Motion") under which the Debtors request an order

authorizing the Debtors to (a) continue insurance and surety bond coverage currently in effect in

the ordinary course of business, (b) revise, extend, renew, supplement or change the insurance

and surety bond coverage, as needed, and (c) to make any related payments (the "Insurance and

Surety Obligations").

71.     The Debtors maintain approximately five insurance policies administered by

several third-party insurance carriers (collectively, the "Insurance Carriers").  Collectively, these

policies provide coverage for, among other things:  (a) property; (b) civil liability; (c) freight

transport; (d) automatable; and (e) directors' and officers' liability (collectively, and including

any new or similar policies entered into by the Debtors upon expiration, the "Insurance

Policies").  A schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit

B.  As of the Petition Date, there are no outstanding amounts owed for the Insurance Policies.

72.     In connection with the Insurance Policies, Nuria Tourne Espuña, a third-party

insurance broker (the "Insurance Broker), assists the Debtors in obtaining comprehensive

insurance coverage in the most cost-effective manner.  The Insurance Broker earns fees, but the

Insurance Carriers rather than the Debtors, pays those fees.  Accordingly, as of the Petition Date,

the Debtors do not owe any amounts for the Insurance Broker's fees.

73.     The Debtors maintain a surety bond program for third parties that require the

Debtors to provide financial assurance of payment and in connection with infrastructure

agreements.  For example, Instituto Federal de Telecomunicaciones (the equivalent of the U.S.

Federal Commission of Telecommunications) requires surety bonds as financial assurance for

the Debtors' government concessions required to provide telecommunication services. A
schedule of the Debtors' surety bonds (collectively, the "Surety Bonds") is attached to the
Insurance Motion as Exhibit C. As of the Petition Date, there are no outstanding amounts owed
for the Surety Bonds.

74.     Maintaining the Insurance Policies and the Surety Bonds is essential to the
preservation of the value of the Debtors' business, properties and assets. Moreover, in many
cases, coverage provided by the Insurance Policies and Surety Bonds is required by the laws,
regulations and contracts that govern the Debtors' commercial activities. It is, therefore, critical
that the Debtors continue to carry the necessary coverage to operate their businesses. As a result,
the Debtors are continually in the process of negotiating renewals, extensions, and/or entry into
new insurance policies and surety bonds with respect to expiring coverage. In fact, the directors
and officers Insurance Policy must be renewed on or before October 1, 2019 and one of the
Surety Bonds will need to be increased during September 2019, in the ordinary course of
business, thus requiring a supplemental premium.

75.     Disruption of the Debtors' insurance and surety bond coverage would expose the
Debtors to serious risks, including:  (a) the incurrence of direct liability for the payment of
claims that otherwise would have been payable by the Insurance Carriers; (b) the occurrence of
material costs and other losses that would have otherwise been reimbursed by the Insurance
Carriers; (c) the potential loss of good-standing status to conduct business in jurisdictions that
require the Debtors to maintain certain levels of third-party coverage; (d) the inability to obtain
similar types of insurance and surety bond coverage; and (e) the incurrence of higher costs for
obtaining new coverage. Failure to maintain adequate coverage or to make the required
payments could jeopardize the Debtors' efforts to complete a consensual restructuring.

Accordingly, the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, their creditors and other parties in interest.

76.      To the extent that there are any outstanding prepetition Insurance and Surety Obligations (I am not aware of any), the Plan provides that they will not be impaired. Accordingly, the relief requested in the Insurance Motion merely expedites the treatment of the Insurance and Surety Obligations that would otherwise occur at a later date under the Plan, thereby avoiding unnecessary harm to the Debtors' business.

77.      Thus, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without unnecessary disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should grant the Insurance Motion.

78.      **Utilities Motion**.  The Debtors will file a Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services and Prohibiting Utility Providers From Altering, Refusing or Discontinuing Services (the "Utilities Motion") requesting entry of interim and final orders (a) determining that the Utility Providers (defined below) have been provided with adequate assurance of payment, (b) approving the Debtors' proposed Adequate Assurance Procedures, and (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

79.     In the ordinary course of business, the Debtors obtain water and electric services from six Utility Providers.[17]  A list of the Utility Providers and corresponding accounts is attached to the Utilities Motion as Exhibit B.  The Debtors' estimated average monthly utility payments to the Utility Providers is approximately $97,500.

80.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' restructuring.  The Debtors must be fully operational 24 hours a day in order to meet the needs of customers.  If the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations will be severely disrupted.  The impact on the Debtors business operations, customer relationships, revenue and profits will be extremely harmful and will jeopardize the Debtors' reorganization efforts.

81.     The Debtors intend to pay the postpetition obligations owed to the Utility Providers in a timely manner.  Cash held by the Debtors and the cash generated in the ordinary course of business will provide sufficient liquidity to pay the Debtors' utility service obligations in accordance with prepetition practice.  To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $49,000 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately two weeks of all of the Debtors' utility services.  The Adequate Assurance Deposit will be held in the segregated account for the duration of these chapter 11 cases to be applied to any postpetition defaults in payment to the Utility Providers.  I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with prepetition practice, provides more than adequate assurance of payment to the Utility Providers.

---

[17]   The Debtors utilize the services of only electric and water Utility Providers because the Debtors' facilities do not use natural gas or heating oil, their waste is removed either by a landlord or by the Debtors, and the Debtors use their own telephone and internet services.

82.     I believe that the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm, is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should grant the Utilities Motion.

83.     **Schedules Extension/Waiver Motion**.  The Debtors will also seek entry of an order (a) extending the time for the Debtors to file schedules and statement of financial affairs (collectively, the "Schedules and Statements") through and including forty-five (45) days after the date required under Bankruptcy Rule 1007(c), without prejudice to the Debtors' right to request additional extensions should it become necessary and (b) waiving the requirement to file the Schedules and Statements altogether upon the effective date of the Plan if the effective date of the Plan occurs on or before the time to file the Bankruptcy Schedules, as extended (the "Schedules Extension/Waiver Motion").

84.     The Debtors' principal assets, other than certain Bank Accounts and rights under the Old Indenture, are located in Mexico.  Under the Plan, the only creditors with debts being restructured voted in support of the Plan and all other claims of the Debtors are being satisfied by the Debtors on the Effective Date or in the ordinary course of business.  Accordingly, I believe that the relief requested in the Schedules Extension/Waiver Motion is appropriate because it (a) will not prejudice or adversely affect the rights of any creditor or other party in interest and (b) will relieve the Debtors of an administrative burden.  The Debtors' focus should be on growing the business and maximizing the value of the New Notes to be issued to the holders of the Old Notes.

85.     **Prime Clerk Claims and Noticing Agent Retention Application**.  The Debtors

seek authority to retain and appoint Prime Clerk as its claims[18] and noticing agent under 28

U.S.C. § 156(c).  As described below, the Debtors will also file an application to retain Prime

Clerk as its Balloting Agent pursuant to section 327 of the Bankruptcy Code.[19]  The application

to retain Prime Clerk as claims and noticing agent pertains only to work to be performed by

Prime Clerk under the Clerk's Office delegation of duties permitted by section 28 U.S.C. §

156(c), Local Rule 5075-1 and the claims agent protocol.  In compliance with the claims agent

protocol, the Debtors reviewed the proposals of at least two other Court-approved claims and

noticing agents to ensure selection through a competitive process.  The Debtors believe, and I

agree, that Prime Clerk's rates are competitive and reasonable as compared to those offered in

the other proposals, and that Prime Clerk is well qualified to provide the services listed herein.

Additionally, the Debtors believe, and I agree, that the indemnification provisions under the

terms of the engagement with Prime Clerk are customary and reasonable for claims and noticing

agents in chapter 11 cases.

86.     A detailed description of the services that Prime Clerk has agreed to render and

the compensation and other terms of the engagement are provided in the Debtors' *Application for

Appointment of Prime Clerk LLC as Claims and Noticing Agent* (the "Section 156(c)

Application").  For the reasons set forth herein and in the retention application, I respectfully

submit that the Section 156(c) Application should be approved.

**PART V**

---

[18]   Given the prepackaged nature of the Chapter 11 Cases and that, the only class of claims solicited under the Plan
has voted in favor of the Plan, the Debtors do not currently anticipate that any claims will be filed in the Chapter
11 Cases.  Nevertheless, in an abundance of caution, the retention of Prime Clerk covers those services as well.

[19]   The Debtors will also file in the near future applications to retain Paul Hastings, LLP and Alvarez & Marsal
México, S.C. as its legal and financial advisors, respectively.

## <u>LOCAL RULE 1007-2 DISCLOSURES</u>

87.     Pursuant to Local Rule 1007-2(a)(1), a statement regarding the nature of the
Debtors' business and the circumstances leading to the filing of the chapter 11 cases is set forth
in Parts I through III above.

88.     The chapter 11 cases were not originally commenced under chapter 7 or chapter
13 of the Bankruptcy Code.  Accordingly, Local Rule 1007-2(a)(2) is inapplicable.

89.     In accordance with Local Rule 1007-2(a)(3), attached as Schedule I lists the
names and addresses of the holders of the Old Notes that organized pre-petition their legal and
financial advisors.

90.     In accordance with Local Rule 1007-2(a)(4), Schedule 2 lists the twenty (20)
largest unsecured claims, excluding the claims of insiders, held against the Debtors as of the
Petition Date.  Schedule 2 includes a list of the names and addresses of each such creditor, and
the names, addresses and telephone numbers of persons familiar with the Debtors' accounts.
Where available, the amount of the claim is also included.  In each case, the claim amount listed
on Schedule 2 represents the Debtors' best estimate of the amount of the claim, and is therefore
subject to verification.  The Debtors reserve any and all rights (i) as to whether any claim is
contingent, unliquidated, disputed or subject to setoff, (ii) challenge the priority, nature, amount
and status of any claim or debt and (iii) to assert any remedies, defenses, counterclaims and
offsets with respect to each of the foregoing.

91.     Pursuant to Local Rule 1007-2(a)(5), Schedule 3 lists the name and address of the
holders of secured claims against the Debtors as of the Petition Date.  Any amount listed on
Schedule 2 represents the Debtors' best estimate, and is therefore subject to verification.  The
Debtors reserve all rights as to the validity, enforceability and priority of each claim and lien

pending approval of the Plan and reserves any and all rights to assert remedies, defenses, counterclaims and offsets with respect to such claim.

92.     Pursuant to Local Rule 1007-2(a)(6), Schedule 4 provides a summary of the Debtors' total assets and liabilities as of July 30, 2019.

93.     Pursuant to Local Rule 1007-2(a)(7), Schedule 5 lists the number and classes of publicly traded debt and equity issued by the Debtors.  The Debtors represent that no officer or director of the Debtors owns any of the Old Notes listed on Schedule 5, but, the following directors of Maxcom Parent, as of April 30, 2019, held the following amounts of Maxcom Parent's outstanding capital stock:  (a) Rodrigo Lebois Mateos — 12.67%; (b) Enrique Castillo Sánchez Mejorada — 9.09%; (c) Javier Molinar Horcasitas — 5.19%; (d) Henry Davis Carstens — 2.88%; (e) Alberto Martin Soberon — 2.10%; and (f) Ricardo Guillermo Amtmann Aguilar — 1.53%.

94.     Pursuant to Local Rule 1007-2(a)(8), Schedule 6 contains a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity.  The Debtors represent that there are no proceedings related to any of the above pending in any court.

95.     Pursuant to Local Rule 1007-2(a)(9), Schedule 7 lists the property or premises owned, leased or held under another arrangement from which the Debtors operate.

96.     Pursuant to Local Rule 1007-2(a)(10), Schedule 8 lists the locations of the Debtors' substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

97.     Pursuant to Local Rule 1007-2(a)(11), I hereby confirm that to the best of my knowledge, as of the Petition Date, there were no pending actions or proceedings against the Debtors, where a judgment against the Debtors or seizure of the Debtors' properties may be imminent as of the Petition Date.

98.     Pursuant to Local Rule 1007-2(a)(12), Schedule 9 lists the Debtors' existing senior management, including their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

99.     Pursuant to Local Rule 1007-2(b)(1), the Debtors estimate that the weekly payroll for employees, exclusive of officers, directors, stockholders and partners, during the 30-day period following the Petition Date will be $0 because a non-debtor affiliate of the Debtors pay all of the Debtors' employees' wages and benefits.  As set forth above and in the Unimpaired Claims Motion and the Cash Management Motion, Maxcom Parent transfers funds to certain non-debtor affiliates on a bi-weekly basis to fund such payroll.  Therefore, because of the forgoing, no amounts will come due in the next 30 days.

100.    Pursuant to Local Rule 1007-2(b)(2), the Debtors estimates that the amount to be paid to the Debtors' officers for the 30-day period following the Petition Date will be $0, because, as with employees, a non-debtor affiliate of the Debtors pays the Debtors' officers and directors their wages and benefits, and no amounts will come due in the next 30 days.  Maxcom Parent pays the board of directors a fee per each board meeting.  No amounts will be paid to the directors in the next 30 days.

101.    Pursuant to Local Rule 1007-2(b)(3), Schedule 10 provides the estimated consolidated cash receipts, disbursements, net cash gain or loss, obligations and receivables

expected to accrue but remain unpaid for the 30 days following the Petition Date, other than professional fees.

102.    Venue of the chapter 11 cases in this district is proper because Maxcom USA is organized under the laws of the State of New York.  In addition, Maxcom USA has amounts on retainer in the trust account of Paul Hastings.

103.    Further, Maxcom Parent has amounts on retainer in the trust account of Paul Hastings.  In addition, the 2013 Old Notes Indenture and the new indenture for the Senior Notes are subject to New York law and provides that Maxcom Parent is subject to service of process in this district, and has submitted to the jurisdiction of the state and federal courts located in Manhattan for any issue or dispute arising under the Old Notes (or the Senior Notes).  Finally, Maxcom Parent's rights under the Old Notes Indenture (governed by New York law) constitute Maxcom Parent's principal asset in the United States.[20]

---

[20]    In addition, certain of Maxcom Parent's other U.S. subsidiaries, Sierra USA Communications, Inc. and Maxcom USA, Inc. also have assets in the U.S., including a telecom infrastructure that is leased to Maxcom Parent.  The Debtors have valued these assets on their books at less than $100,000.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 19, 2019
New York, New York

*/s/ Erik Gonzalez Laureano*
Erik Gonzalez Laureano
Chief Financial Officer

**<u>EXHIBIT A</u>**
Debtors' Organizational Chart

**Maxcom Telecomunicaciones, S.A.B de C.V.**

Corporate Structure Summary Table

Date: August 14, 2019

| # [1] | Name | | Country | Description / Objective | Ownership | Highlights | Guarantor to Notes |
|---|---|---|---|---|---|---|---|
| 5 | Maxcom Telecomunicaciones, S. A. B. de C. V. | [2] | Mex | Holding Company | 62.10% general public, 10.13% Rodrigo Lebois, 8.88% Fideicomiso 744869 Banorte, 6.89% Enrique Castillo, 5.22% Javier Molinar, 3.82% Wilfrido Castillo, 2.96% Henry Davis | Provides services to customers. Owner of most subs at a 99.99% and Mex SE trading company | Yes |
| 20 | Outsourcing Operadora de Personal, S. A. de C. V. | | Mex | Payroll Services for Holding Company | 99.998 % Maxcom Telecom, 0.002% TECBTC | To be merged with Holding Company | Yes |
| 25 | TECBTC Estrategias de Promoción, S. A. de C. V. | [3] | Mex | Payroll Services for Holding Company | 99.998 % Maxcom Telecom, 0.002% Telcoop | To be merged with Holding Company | Yes |
| 30 | Maxcom SF, S. A. de C. V. | | Mex | Financial Services for Intercompany | 99.998 % Maxcom Telecom, 0.002% TECBTC | To be merged with Holding Company. Holds accounts receivable from Maxcom | Yes |
| 35 | Maxcom USA, Inc. | | USA | Constituted to invoice foreign clients | 100% Maxcom Telecom | Company in the US. Never utilized. To be reactivated | Yes |
| 40 | Maxcom TV, S. A. de C. V. | | Mex | Company had concession to provide T.V. services | 99.998 % Maxcom Telecom, 0.002% TECBTC | To be merged with Holding Company. Never utilized | Yes |
| 45 | Telereunión, S. A. de C. V. | | Mex | Infrastructure lease to Holding Company | 99.999 % Maxcom Telecom, 0.001% TECBTC | To be merged with Holding Company. Company acquired from 3rd party | Yes |
| 50 | Sierra USA Communications, Inc. | | USA | Infrastructure lease to Holding Company | 100% Maxcom Telecom | Company acquired from 3rd party. | Yes |
| 55 | Telscape de México, S. A. de C. V. | | Mex | Real estate lease to Holding Company and to a 3rd party | 99.999 % Maxcom Telecom, 0.001% TECBTC | Company acquired from 3rd party | Yes |
| 60 | Sierra Comunicaciones Globales, S. A. de C. V. | | Mex | Infrastructure lease to Holding Company | 99.999 % Maxcom Telecom, 0.001% TECBTC | To be merged with Holding Company. Company acquired from 3rd party | Yes |
| 65 | Asesores Telcoop, S. A. de C. V. | [4] | Mex | Payroll Services for Holding Company | 99.998 % Maxcom Telecom, 0.002% TECBTC | Holds risk 5 employees | Yes |
| 70 | Celmax Movil, S. A. de C. V. | | Mex | Joint Venture with 3rd parties (individuals) | 51% Maxcom Telecom, 49% 3rd parties (individuals) | To be deconsolidated in September 2019 | Yes |
| 80 | Maxcom USA, Telecom, Inc. | | USA | [Assorted services in the USA] | [100% Maxcom Holding] | Recently created | [Yes] |

Notes:

[A] Subsidiaries to be merged during 2019

[B] Joint Venture

[C] List does not include Fundación Maxcom, A.C., which is a non-for-profit, executes donations and is not a guarantor for the notes

[1] Internal number used by Maxcom to identify each subsidiary

[2] Also referred to as Maxcom Telecom or Holding Company

[3] Also referred to as TECBTC

[4] Also referred to as Telcoop

**Maxcom Telecomunicaciones, S.A.B de C.V.**
Corporate Structure Summary
Date: August 14, 2019



SCHEDULE 1

**The Holders of the Old Notes That Approached Debtors Prepetition**

Pursuant to Local Rule 1007-2(a)(3), following are the names and addresses of the holders of the Old Notes that approached the Debtors pre-petition and their legal and financial advisors to the extent known by the Debtors.

| | |
|---|---|
| Holders of the Old Notes | Mr. Ignacio Fernandez<br>Moneda Asset Management<br>Av. Isidora Goyenechea 3621<br>Santiago, Chile<br>Tel: 56-2-2337-7900<br>E-mail: ifernandez@moneda.cl |
| | Mr. Andrés Segú<br>Megeve Investments<br>Espoz 3150<br>Santiago, Chile<br>Tel: 56-2-2577-3600<br>E-mail: asegu@megeve.cl |
| | Mr. Patrick Kiblisky<br>UBS Financial Services, Inc.[21]<br>100 SE 2nd Street<br>Miami, FL 33131<br>Tel: 305-536-9277<br>E-mail: pkiblisky@msn.com  & patrick.kiblisky@ubs.com |
| Legal Counsel | Ronald R. Jewell, Esq.<br>Email:  rrjewell1949@outlook.com |
| | Alejandro Sainz, Esq.<br>Cervantes Sainz, S.C.<br>Torre del Bosque<br>Blvd. Manuel Avila Camacho 24-20 piso<br>Col. Lomas de Chapultepec<br>Cuidad de Mexico.  11000<br>Mexico<br>Tel:  52-55-917-850-47<br>Email:  asainz@cervantesainz.com |
| Financial Advisor | Mr. Zain A. Manekia<br>Cicerone Advisers LLC<br>140 Broadway, 46th Floor<br>New York, NY 10005<br>Tel: 212-371-9115<br>Email:  zain@ciceroneadvisers.com |

---

[21]    It is the Debtors' understanding that UBS Financial Services, Inc. is not acting for itself, but instead as private banker to certain holders of the Old Notes.

1

Schedule 2

**Twenty Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of Maxcom Parent's creditors holding the twenty (20) largest unsecured claims, excluding insiders, based on Maxcom Parent's unaudited books and records as of August 16, 2019.  Maxcom USA has no creditors.  The Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. Any amounts listed herein are estimated, on a preliminary basis, and subject to verification. The Debtors reserve any and all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | NAME OF CREDITOR | COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, PARTIALLY SECURED OR SUBJECT TO SETOFF | AMOUNT OF CLAIM (USD) |
|---|---|---|---|---|---|
| 1. | QUALTEL SA DE CV M. Herrera FRANCISCO FERNANDEZ TREVIÑO 475 LEONES MONTERREY MONTERREY 64600 Mexico | QUALTEL SA DE CV M. Herrera PHONE: +528117693022 FAX: EMAIL: mherrera@qualtel.com.mx | Services | | $1,700,615.22 |
| 2. | Instituto Federal de Telecomunicaciones IFT Insurgentes Sur #1143, Col. Nochebuena 03720 Mexico | Instituto Federal de Telecomunicaciones IFT PHONE: 55 5015 4000 FAX: EMAIL: atencion@ift.org.mx | Fine | Contingent and Disputed | $1,054,404.41 |

| | | | | | |
|---|---|---|---|---|---|
| 3. | NEC DE MEXICO SA DE CV<br>M. Ramirez<br>JAIME BALMES 8<br>COL LOS MORALES<br>POLANCO<br>11510<br>Mexico | NEC DE MEXICO SA DE CV<br>M. Ramirez<br>PHONE: +525521226500<br>FAX:<br>EMAIL: mramirez@nec.com.mx | Goods | | $210,318.45 |
| 4. | MXT EAGLE TOWERS<br>SAPI DE CV<br>Oliver Deleau<br>PEDREGAL 24 PISO 3<br>PISO 3<br>MOLINO DEL REY<br>11040<br>Mexico | MXT EAGLE TOWERS SAPI DE CV<br>Oliver Deleau<br>PHONE: +525541298523<br>FAX:<br>EMAIL:<br>oliver.deleau@mxtowers.co | Sale and<br>Leaseback | | $202,804.60 |
| 5. | DATAVISION DIGITAL<br>SA DE CV<br>Jaime Lama<br>PATRIOTISMO 8<br>COL CONDESA 12200<br>Mexico | DATAVISION DIGITAL SA DE CV<br>Jaime Lama<br>PHONE: +525541951100<br>FAX:<br>EMAIL:<br>jaime.lama@datavision.com.mx | Services | | $172,114.61 |
| 6. | WESTCON MEXICO SA<br>DE CV<br>Customer Service<br>CALLE LAGO<br>VICTORIA 74 PISO<br>PISO 7<br>COL GRANADA 11520<br>Mexico | WESTCON MEXICO SA DE CV<br>Customer Service<br>PHONE: +525541603257<br>FAX:<br>EMAIL: anyluv@comstor-la.com | Goods | | $139,554.45 |
| 7. | PROCOM SERVICIOS<br>INTELIGENTES<br>Ricardo Pelusi<br>MONTES ATHOS 355<br>302 355   302<br>LOMAS DE<br>CHAPULTEPEC III<br>11000<br>Mexico | PROCOM SERVICIOS<br>INTELIGENTES<br>Ricardo Pelusi<br>PHONE: +525562864325<br>FAX:<br>EMAIL: ricardo.pelusi@procom   inc | Services | | $133,869.96 |

3

| | | | | | |
|---|---|---|---|---|---|
| 8. | ALCATEL LUCENT MEXICO SA DE CV<br>Eduardo Velazquez<br>CIENCIA 13 13<br>SIN NUMERO PARQUE INDUSTRIAL 54730<br>Mexico | ALCATEL LUCENT MEXICO SA DE CV<br>Eduardo Velazquez<br>PHONE: +525526209200<br>FAX:<br>EMAIL:<br>eduardo.velazquez@nokia.c | Maintenance | | $113,796.00 |
| 9. | INNOVACONECT S DE RL DE CV<br>Juan B.M.<br>Rio tuxpan 1<br>PASEOS DE CHURUBUSCO 09030<br>Mexico | INNOVACONECT S DE RL DE CV<br>Juan B.M.<br>PHONE: +525531785086<br>FAX:<br>EMAIL:<br>juanbm@innovaconect.com | Maintenance | | $104,284.00 |
| 10. | SK HOLDINGS SA DE CV<br>Carlos<br>PASEO DE LOS ENCINOS 38<br>FRACC LOS ENCINOS KM 46 52000<br>Mexico | SK HOLDINGS SA DE CV<br>Carlos<br>PHONE: +527282823258<br>FAX:<br>EMAIL: carlos@skh.mx | Maintenance | | $84,334.34 |
| 11. | IP MATRIX SA DE CV<br>Accounts Receivable<br>CAMPOS ELISEOS 9050 H1 9050<br>H1<br>CAMPOS ELISEOS 32472<br>Mexico | IP MATRIX SA DE CV<br>Accounts Receivable<br>PHONE: +526562571281<br>FAX:<br>EMAIL: ar@transtelco.net | Services | | $74,625.47 |
| 12. | PROFESIONALES EN COMPUTACION SA DE<br>Irene Antonio<br>XICOTENCATL 109<br>COL DEL CARMEN COYOACAN<br>04100<br>Mexico | PROFESIONALES EN COMPUTACION SA DE<br>Irene Antonio<br>PHONE: +525586785489<br>FAX:<br>EMAIL:<br>irene_antonio@pco.com.mx | Goods | | $74,285.50 |
| 13. | AXTEL S.A.B DE CV<br>A. Ceballos<br>BLVD DIAZ ORDAZ KM 3.33 L  1<br>COL UNIDAD SAN PEDRO 66215<br>Mexico | AXTEL S.A.B DE CV<br>A. Ceballos<br>PHONE: +528147701134<br>FAX:<br>EMAIL: aceballos77@gmail.com | Services | | $59,105.85 |
| 14. | LEVEL SMS SA DE CV<br>Customer Service<br>PASEO DE LAS PALMAS 215 304D<br>304D<br>LOMAS DE CHAPULTEPEC 1 SE 11000<br>Mexico | LEVEL SMS SA DE CV<br>Customer Service<br>PHONE: +525551478040<br>FAX:<br>EMAIL: smsadmin@c3ntro.com | Services | | $55,229.98 |
| 15. | ATC HOLDING FIBRA MEXICO<br>Carolina Zainos<br>JUAN VAZQUEZ DE MELLA 48<br>PISO5<br>LOS MORALES POLANCO 11510<br>Mexico | ATC HOLDING FIBRA MEXICO<br>Carolina Zainos<br>PHONE: +525588501602<br>FAX:<br>EMAIL: Carolina.zainos@americant | Maintenance | | $48,946.03 |

| 16. | DUPRA SYSTEMS SA DE CV<br>C. Duran<br>CALLE TAXCO 14 506<br>7 506  7<br>ROMA SUR 06760<br>Mexico | DUPRA SYSTEMS SA DE CV<br>C. Duran<br>PHONE: +525552644058<br>FAX:<br>EMAIL:<br>cduran@duprasystems.com | Services | | $45,820.36 |
| 17. | Secretaria de Couminaciones y Transporte<br>SCT<br>Insurgentes Sur 1089<br>Col. Nochebuena 03720<br>Mexico | Secretaria de Couminaciones y Transporte<br>SCT<br>PHONE: 55  57  23  93  00<br>FAX:<br>EMAIL: buzon_ucg@sct.gob.mx | Fine | Contingent and Disputed | $43,389.20 |
| 18. | GRUPO POLMESA SA DE CV<br>Treviño<br>PLAN SEXENAL 3760<br>3760 3760<br>JARDIN REVOLUCION,<br>TLAQUEPAQUE 45580<br>Mexico | GRUPO POLMESA SA DE CV<br>Treviño<br>PHONE: +523310295003<br>FAX:<br>EMAIL: trev@prodigy.net.mx | Services | | $42,180.31 |
| 19. | JAG TELECOM SA DE CV<br>Camacho<br>LA GARITA 31 LT 4<br>COL CALPULTITLA<br>55700<br>Mexico | JAG TELECOM SA DE CV<br>Camacho<br>PHONE: +525565847696<br>FAX:<br>EMAIL:<br>camachosua@jagtelecom.com | Services | | $41,293.58 |
| 20. | VICTOR HUGO RODRIGUEZ LOPEZ<br>Victor Hugo Rodriguez<br>HORNERO 2 1 1<br>LA PRADERA EL MARQUES 76269<br>Mexico | VICTOR HUGO RODRIGUEZ LOPEZ<br>Victor Hugo Rodriguez<br>PHONE: +524422675039<br>FAX:<br>EMAIL: hugo1978_@hotmail.com | Services | | $39,300.66 |

SCHEDULE 3

**List of the Holders of Secured Claims**

Consistent with Local Rule 1007-2(a)(5), the following is a list of creditors holding secured claims against Maxcom Parent, excluding claims of insiders as defined in 11 U.S.C. § 101(31). The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The amount listed herein is estimated, on a preliminary basis, and subject to verification. The description of the collateral securing such claims is intended only as a brief summary. In the event of any inconsistency between the summary set forth below and the respective corporate and legal documents relating to the secured claims, the descriptions in the corporate and legal documents shall control.  Maxcom USA has no secured creditors.

| CREDITOR NAME AND ADDRESS | AMOUNT OF CLAIM | COLLATERAL DESCRIPTION | ESTIMATED VALUE OF COLLATERAL |
|---|---|---|---|
| Banco Nacional de Comercio Exterior, S.N.C.<br><br>Periférico Sur 4333, Colonia Jardines en la Montaña, Delegación Tlalpan, México, Ciudad de México, C.P. 14210 | $1.84 million | Funds deposited in Trust Account | $454,942.13[22] |
| U.S. Bank N.A., as Indenture Trustee for Step-Up Senior Notes due 2020<br>100 Wall Street, Suite 600, New York, NY 10005 | $103,378,674 | Fixed Assets | $114,147,000[23] |

---

[22]    Calculated by using the buying rate for pesos reported by the Banco de Mexico as of August 16, 2019 in the amount of Ps. 19.5763 per $1.00.  As set forth above, the amounts in such Trust Account that exceed the monthly debt service payment will be transferred to Maxcom Parent.

[23]    The Old Notes are also secured by the fixed assets of certain of Maxcom Parent's subsidiaries.  As of June 30, 2019, the Debtors estimate that such subsidiaries' fixed assets are worth in the aggregate $3,448,000.

SCHEDULE 4

**Summary of the Debtors' Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of Maxcom Parent's assets and liabilities (book value) as of July 31, 2019.  The information contained herein shall not constitute an admission of liability by, nor is it binding upon Maxcom Parent.  The only asset of Maxcom USA is the retainer paid to Paul Hastings LLP which will be disclosed in the application to retain such firm.

| ASSETS AND LIABILITIES | AMOUNT |
|---|---|
| Total Assets (book value as of July 31, 2019) | USD $360,765,884 |
| Total Liabilities (book value as of July 31, 2019) | USD $294,935,064 |

SCHEDULE 5
**List of Publicly Held Securities of the Debtors**

Pursuant to Local Rule 1007-2(a)(7), the following list the debt securities of Maxcom Parent that are publicly held.  Maxcom USA has not issued debt securities.

**Bond Debt**

| DESCRIPTION | ISSUANCE | ISSUE AMOUNT | OUTSTANDING PRINCIPAL AMOUNT | MATURITY |
|---|---|---|---|---|
| Step-Up Senior Notes | October 11, 2013 | $180,400,000 | $103,378,674 | 2020 |

**Equity Interests**

| DESCRIPTION | ISSUANCE | SHARES OUTSTANDING |
|---|---|---|
| Series A Common Stock | October 17, 2007[24] | 144,471,081 |

---

[24] Effective October 17, 2007, existing Series A, B, and N shares were modified and/or reclassified to Series A.

SCHEDULE 6

**Summary of Debtors' Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following schedule lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

As explained above, the Bancomext has an interest in funds placed into the Trust Account arising from proceeds of certain specific accounts receivable of Maxcom Parent. Banorte, as trustee, transfers the proceeds directly from Maxcom Parent's account at BBVA. After Banorte makes the monthly debt service to Bancomext from such trust, Banorte sends to Maxcom Parent the surplus remaining in the trust. There is currently approximately $454,942.13 in the Trust Account.[25] If, during the first 15 days of any month, the balance in the BBVA Account (9809) falls below the coverage ratio of 2.5 times the monthly debt service, Banorte directs Maxcom Parent to wire funds from such Santander account to the Trust Account to ensure that the amounts on deposit are sufficient to satisfy the coverage ratio.

Note:  Professionals seeking retention in this Chapter 11 Case will disclose their retainers in their respective retention applications.

---

[25]    Calculated by using the buying rate for pesos reported by the Banco de Mexico as of August 16, 2019 in the amount of Ps. 19.5763 per $1.00.

SCHEDULE 7

## **Schedule of Owned and Leased Property**

Pursuant to Local Rule 1007-2(a)(9), the following schedule lists the property or premises owned, leased or held under other arrangement from which Maxcom Parent operates its businesses as of the Petition Date.

**Schedule 7.9**
**Property Leased by Maxcom Parent**

| # | Name of Property | Type of Leasing |
|---|---|---|
| 1 | MAQUINARIA | SITE RENTAL |
| 2 | MORALES | SITE RENTAL |
| 3 | VILLA DE LAS FLORES | SITE RENTAL |
| 4 | PIRULES | SITE RENTAL |
| 5 | SAN ANDRÉS | RENTAL OF WAREHOUSES AND OFFICES |
| 6 | LOMAS DE LA HACIENDA | RENTAL OF WAREHOUSES AND OFFICES |
| 7 | LD AGUASCALIENTES | SITE RENTAL |
| 8 | TAMAULIPAS 150 | SITE RENTAL |
| 9 | LA MARIA | SITE RENTAL |
| 10 | ESTACIONAMIENTO ANEXO | RENTAL OF WAREHOUSES AND OFFICES |
| 11 | VALLE TECNOLOGICO | SITE RENTAL |
| 12 | SAN LORENZO | SITE RENTAL |
| 13 | RANCHO PAVON | SITE RENTAL |
| 14 | TEHUACAN INDEPENDENCIA | SITE RENTAL |
| 15 | JARDINES DE CASANUEVA | SITE RENTAL |
| 16 | BODEGA ACTIVO FIJO | RENTAL OF WAREHOUSES AND OFFICES |
| 17 | AUTOPISTA | SITE RENTAL |
| 18 | CHIMALHUACAN | SITE RENTAL |
| 19 | VILLAS DE ATLIXCO | SITE RENTAL |
| 20 | NUEVO SITIO TORRE FUERTE | SITE RENTAL |
| 21 | LOPEZ MATEOS I | SITE RENTAL |
| 22 | EL SOL | SITE RENTAL |
| 23 | TORRE ZAFIRO | SITE RENTAL |
| 24 | CHALCO AUTOPISTA | SITE RENTAL |
| 25 | ESTADIO NEZA | SITE RENTAL |
| 26 | CORDOBA VERACRUZ | SITE RENTAL |
| 27 | SANTA CLARA | SITE RENTAL |
| 28 | SCT | SITE RENTAL |
| 29 | ESTADO DE MEXICO | SITE RENTAL |
| 30 | CAC AMERICAS | RENTAL OF WAREHOUSES AND OFFICES |
| 31 | JARDINES DE MORELOS | SITE RENTAL |
| 32 | CAC GLORIETA | RENTAL OF WAREHOUSES AND OFFICES |
| 33 | ZOPILOCALCO | SITE RENTAL |
| 34 | CHURUBUSCO | SITE RENTAL |
| 35 | RESIDENCIAL SAUCES | SITE RENTAL |
| 36 | TORRE SATÉLITE | SITE RENTAL |
| 37 | TULTEPEC | SITE RENTAL |
| 38 | TORRE DIAMANTE | SITE RENTAL |
| 39 | JARDINES DE MORELOS 2 | SITE RENTAL |
| 40 | TOREO | SITE RENTAL |
| 41 | TORRE MAYOR | SITE RENTAL |
| 42 | WEB SYSTEM | SITE RENTAL |
| 43 | NACIONES UNIDAS | SITE RENTAL |
| 44 | POPOCATEPETL | SITE RENTAL |
| 45 | FUERTES | SITE RENTAL |

| 46 | SWITCH QUERETARO | SITE RENTAL |
|----|----|----|
| 47 | 20 DE NOVIEMBRE | SITE RENTAL |
| 48 | HOTEL ONE | SITE RENTAL |
| 49 | EL LAUREL | SITE RENTAL |
| 50 | SAN LORENZO TEZONCO | SITE RENTAL |
| 51 | INDEPENDENCIA PONIENTE | SITE RENTAL |
| 52 | EL BARCO | SITE RENTAL |
| 53 | LD IRAPUATO | SITE RENTAL |
| 54 | METROPOLITANA | SITE RENTAL |
| 55 | TORRE A | SITE RENTAL |
| 56 | PLAZA ANTARA | SITE RENTAL |
| 57 | OFICINAS SANTA FE PISO 1 | RENTAL OF WAREHOUSES AND OFFICES |
| 58 | OFICINAS SANTA FE PISOS PI | RENTAL OF WAREHOUSES AND OFFICES |
| 59 | POP TOLUCA | SITE RENTAL |
| 60 | POLVORIN | SITE RENTAL |
| 61 | ALAMEDA VERACRUZ | SITE RENTAL |
| 62 | PLAZA GALERIAS | SITE RENTAL |
| 63 | CERRO DE LA BANDERA | SITE RENTAL |
| 64 | LD MONTERREY | SITE RENTAL |
| 65 | FORO SOL | SITE RENTAL |
| 66 | TORRE LATINO | SITE RENTAL |
| 67 | WTC | SITE RENTAL |
| 68 | RADIO CENTRO | SITE RENTAL |
| 69 | BODEGAS CEYLAN | RENTAL OF WAREHOUSES AND OFFICES |
| 70 | REFORMA 199 | SITE RENTAL |
| 71 | PLAZA INVERLAT | SITE RENTAL |
| 72 | TORRE LATINO | SITE RENTAL |
| 73 | ESTACIONAMIENTO CEYLAN | SITE RENTAL |
| 74 | TEHUACAN | SITE RENTAL |
| 75 | HOTEL GRAN VALLE CIUDAD | SITE RENTAL |
| 76 | ROSSEAU 14 | SITE RENTAL |
| 77 | SIERRA USA MC ALLEN | RENTAL OF WAREHOUSES AND OFFICES |
| 78 | TORRE GEMINIS | SITE RENTAL |
| 79 | LD CELAYA | SITE RENTAL |
| 80 | CAC ARAGON | RENTAL OF WAREHOUSES AND OFFICES |
| 81 | EDIFICIO EME | RENTAL OF WAREHOUSES AND OFFICES |
| 82 | VALLEJO | SITE RENTAL |
| 83 | POP GUADALAJARA | SITE RENTAL |
| 84 | FRACC DEL LLANO | SITE RENTAL |
| 85 | INSURGENTES | SITE RENTAL |
| 86 | JESUS MARIA | SITE RENTAL |
| 87 | RINCON DEL PARQUE | SITE RENTAL |
| 88 | SALIDA A SAN LUIS | SITE RENTAL |
| 89 | SIGLO XXI | SITE RENTAL |
| 90 | TEXCOCO | SITE RENTAL |
| 91 | CHICOLOAPAN | SITE RENTAL |
| 92 | OBRERISMO | SITE RENTAL |

| | | |
|---|---|---|
| 93 | PUEBLO DE AYOTLA | SITE RENTAL |
| 94 | BARRIO CANASTEROS | SITE RENTAL |
| 95 | LA PAZ | SITE RENTAL |
| 96 | MEGA CHALCO | SITE RENTAL |
| 97 | MEGA CHIMALHUACAN | SITE RENTAL |
| 98 | CHIMALHUACAN | SITE RENTAL |
| 99 | LOS HORNOS | SITE RENTAL |
| 100 | ALFREDO BARRANDA | SITE RENTAL |
| 101 | TOPILEJO | SITE RENTAL |
| 102 | LA PALMA | SITE RENTAL |
| 103 | TUXPAN 2 | SITE RENTAL |
| 104 | HACIENDA REAL DE TULTEPE | SITE RENTAL |
| 105 | NUEVO SITIO MONTEREY | SITE RENTAL |
| 106 | HEROES DE IXTAPALUCA | SITE RENTAL |
| 107 | LA QUEBRADA | SITE RENTAL |
| 108 | LOMAS DE LA HACIENDA | SITE RENTAL |
| 109 | PANTITLAN MUNICIPIO NEZ/ | SITE RENTAL |
| 110 | CARLOS HANK GONZALEZ | SITE RENTAL |
| 111 | RIO FRIO | SITE RENTAL |
| 112 | LS DLP | SITE RENTAL |
| 113 | OLIMPICO | SITE RENTAL |
| 114 | DAKOTA | SITE RENTAL |
| 115 | SANTA APOLONIA | SITE RENTAL |
| 116 | LAS AMERICAS | SITE RENTAL |
| 117 | HUEJOTZINGO | SITE RENTAL |
| 118 | SAN MARTIN TEXMELUCAN | SITE RENTAL |
| 119 | SAN ANDRES DE LA CAÑADA | SITE RENTAL |
| 120 | JAIME BALMES | SITE RENTAL |
| 121 | TORRE PINE | SITE RENTAL |
| 122 | NODO LEON | SITE RENTAL |
| 123 | FLORIDA | SITE RENTAL |
| 124 | LD SALTILLO | SITE RENTAL |
| 125 | PROLONGACION REFORMA : | SITE RENTAL |
| 126 | VALLE DE CEYLAN | SITE RENTAL |
| 127 | CENTRAL ANIMAS | RENTAL OF WAREHOUSES AND OFFICES |
| 128 | LAS AGUILAS | SITE RENTAL |
| 129 | INDEPENDENCIA | SITE RENTAL |
| 130 | INDEPENDENCIA (SCT) | SITE RENTAL |
| 131 | NUEVO CUAUTITLAN | SITE RENTAL |
| 132 | IGNACIO PICHARDO | SITE RENTAL |
| 133 | LOPEZ MATEOS 2 | SITE RENTAL |
| 134 | BOSQUES ECATEPEC | SITE RENTAL |
| 135 | HACIENDA DE LAS FLORES | SITE RENTAL |
| 136 | LD NUEVO LAREDO | SITE RENTAL |
| 137 | SWITCH MAGDALENA | SITE RENTAL |
| 138 | OAXACA 112 | SITE RENTAL |
| 139 | CAC MUÑOZ | RENTAL OF WAREHOUSES AND OFFICES |

| 140 | CAC PIRULES | RENTAL OF WAREHOUSES AND OFFICES |
|-----|-------------|-----------------------------------|
| 141 | MARFLO INSURGENTES | SITE RENTAL |
| 142 | TORRE BBG | SITE RENTAL |
| 143 | ALBORADA HOMEX | SITE RENTAL |
| 144 | MARAVILLAS | SITE RENTAL |
| 145 | MAGDALENA FASE 03 | SITE RENTAL |
| 146 | EL MARQUES | SITE RENTAL |
| 147 | IZTAPALAPA | SITE RENTAL |

**Schedule 22**

**Sites Owned by Maxcom Parent**

| No. | Site Name | Address |
|---|---|---|
| 1 | PLAZA ESTRELLA ATLACOMULCO | |
| 2 | AMERICAS I | AV. MIGUEL HIDALGO 343, MZ.56 LOT.69, ESQ. AV. SAN JOSE MARTIN, FRACC. LAS AMERICAS, ECATEPEC |
| 3 | AMERICAS II | AV. MARIANO ABASOLO MZ 23 LOT. 1, ESQ. AV. SIMON BOLIVAR, FRACC. LAS AMERICAS, ECATEPEC |
| 4 | AMERICAS III | IGNACIO ALLENDE 37, MZ 108 LOT.70, ESQ. AV. SIMON BOLIVAR, FRACC. LAS AMERICAS, ECATEPEC |
| 5 | AMERICAS IV | IGNACIO LOPEZ RAYON 236, MZ. 35, LOT. 1,  ESQ. AV. IGNACIO ALDAMA, FRACC. LAS AMERICAS, ECATEPEC |

| | | |
|---|---|---|
| 6 | HEROES TECAMAC SECC II Y V | SECCION V, BOSQUE DE LAS MORAS  MZ 96 LT 22 FRACC LOS HEROES TECAMAC (REALIDAD MEXIQUENSE)  TECAMAC  TECAMAC DE FELIPE VILLANUEVA,  MX  MEXICO 00000 |
| 7 | EX HACIENDA SANTA INES | HACIENDA LA PURISIMA LOTE 64, MANZANA 57, EX HACIENDA SANTA INES, NEXTLALPAN, ESTADO DE MEXICO |
| 8 | SAN MARTIN XICO | LOTE 16, MANZANA 16, CONJUNTO URBANO REAL DE SAN MARTIN, VALLE DE CHALCO SOLIDARIDAD |
| 9 | AGUA AZUL | 5 SUR 5747, FRACCIONAMIENTO VILLA ENCANTADA, PUEBLA |
| 10 | BOSQUES DE MANZANILLA | CANAL DE CUATLAZINGO, CASA 1-6 GALAXIA BOSQUES DE MANZANILLA EN PUEBLA, PUEBLA |
| 11 | HACIENDA SAN JOSE CHAPULCO | PROLONGACION 133 PONIENTE 12624, CASA 27-3, LOTE 27, MANZANA 5, CONJUNTO HABITACIONAL HACIENDA SAN JOSE, EX HACIENDA DE CHAPULCO, PUEBLA |
| 12 | MAYORAZGO | BENITO JUAREZ NO. 6512 A, COL. VICENTE GUERRERO, C.P. 72470 |
| 13 | SANTA MARIA (SAN PEDRO) | GRAN AVENIDA 2018, FRACCIONAMIENTO HADAS, PUEBLA 72130  MEXICO |
| 14 | SAN BARTOLO | RETORNO 3D SUR 4 , UNIDAD HABITACIONAL LOMA BELLA, PUEBLA,  72130 |
| 15 | POP TEHUACAN - NACIONES UNIDAS | PROLONGACIÓN BENITO JUÁREZ NORTE  3412, NICOLÁS DE TETETZINTLA, TEHUACAN, PUEBLA, C.P. 75701 |
| 16 | HACIENDA SANTA CLARA I | AV. 131 PONIENTE 2727 "C", FRACCIONAMIENTO HACIENDA SANTA CLARA, PUEBLA, PUEBLA |
| 17 | HACIENDA SANTA CLARA II | AV. 141 PONIENTE 2907, LOTE 2, MANZANA 15, FRACCIONAMIENTO HACIENDA SANTA CLARA, PUEBLA, PUEBLA |

| 18 | AEROPUERTO | AVENIDA DEL SOL 215 LT-2 MZ-7 AEROPUERTO SLP |
| 19 | QUINTAS DE LA HACIENDA | SIERRA NEVADA 112 FRACC. SIERRA BONITA SLP |
| 20 | 21 DE MARZO | LAZARO CÁRDENAS 621   21 DE MARZO SLP |
| 21 | SAUCITO | SAN VICENTE MARTIR S/N RANCHO DE LA CRUZ SLP |

SCHEDULE 8

**Location of Debtors' Substantial Assets, Books and Records, and Nature and
Location of Assets Outside of the United States**

Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtors'
substantial assets and books and records, and the nature, location, and value of any assets held by
the Debtors outside the territorial limits of the United States as of the Petition Date:

| DEBTOR'S ASSETS | LOCATION |
|---|---|
| Maxcom Parent Substantial Assets | See attached schedule. |
| Maxcom Parent Books and Records | Guillermo González Camarena, 2000, Centro Ciudad, Santa Fé, Mexico, CDMX. |
| Maxcom USA Substantial Assets | Retainers on deposit in New York with professionals. |
| Maxcom USA Books and Records | Guillermo González Camarena, 2000, Centro Ciudad, Santa Fé, Mexico, CDMX. |

Schedule 2
Location of Maxcom Parent Substantial Assets

**In USD*

| Location | Acquisition Value | | Amortization | Net Value as of December 31, 2018 |
|---|---|---|---|---|
| Aguascalientes | $ | 482,687 | $ (87,126) | $ 395,561 |
| Baja California | | 845 | - 72 | 773 |
| Baja California Sur | | 2,115 | - 24 | 2,092 |
| Chihuahua | | 313,879 | - 20,710 | 293,169 |
| Ciudad de Mexico | | 246,647,571 | - 158,083,209 | 88,564,362 |
| Ciudad de México | | 1,029,869 | - | 1,029,869 |
| Coahuila | | 265,466 | - 30,930 | 234,536 |
| Durango | | 14,144 | - 2,072 | 12,072 |
| Estado de Mexico | | 19,110,127 | - 6,105,354 | 13,004,773 |
| Guanajuato | | 1,078,145 | - 295,460 | 782,685 |
| Hidalgo | | 10,025 | - 1,780 | 8,245 |
| Jalisco | | 2,281,322 | - 305,597 | 1,975,725 |
| Michoacan | | 99,874 | - 59,174 | 40,700 |
| Morelos | | 30,680 | - 2,479 | 28,201 |
| Nuevo León | | 6,989,781 | - 2,437,956 | 4,551,825 |
| Oaxaca | | 2,115 | - 24 | 2,092 |
| Puebla | | 6,075,636 | - 2,239,961 | 3,835,674 |
| Queretaro | | 3,405,125 | - 1,281,667 | 2,123,458 |
| Quintana Roo | | 26,114 | - 2,647 | 23,468 |
| San Luis Potosi | | 2,428,911 | - 493,626 | 1,935,285 |
| Sinaloa | | 295,231 | - 236,740 | 58,490 |
| Sonora | | 3,596 | - 460 | 3,137 |
| Tabasco | | 672 | - 80 | 593 |
| Tamaulipas | | 596,979 | - 57,548 | 539,431 |
| Texas | | 68,935 | - 23,326 | 45,609 |
| Tlaxcala | | 13,794 | - 5,484 | 8,310 |
| Veracruz | | 1,705,904 | - 304,795 | 1,401,109 |
| Other | | 830,320 | - 717,127 | 113,193 |
| **Grand Total** | $ | **293,809,861** | $ **(172,795,426)** | $ **121,014,436** |

SCHEDULE 9

**Debtors' Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their responsibilities and relevant experience as of the Petition Date:[26]

| NAME | TITLE | RESPONSIBILITY | TENURE |
|------|-------|----------------|--------|
| Lauro Cantu Frias | Chief Executive Officer of Maxcom Parent | Directs company's operations, sales, and management of business plan; over 15 years' experience in senior management positions | Oct. 2016 |
| Erik Gonzalez Laureano | Chief Financial Officer of Maxcom Parent | Directs finance, accounting, budgeting, planning, and information technology; over 19 years' experience in senior management positions | Apr. 2017 |
| Erik Gonzalez Laureano | Chief Executive officer of Maxcom USA | Directs policies, manages business, property, and affairs of corporation | Aug. 2019 |

13

SCHEDULE 10

**Schedule of 30 Day Estimated Cash Receipts and Disbursements**

Pursuant to Local Rule 1007-2(b)(3), the following schedule provides, for the 30 day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees:

| Type | Estimated Amount |
|------|------------------|
| Cash Receipts | $4,059,736 |
| Cash Disbursements | $2,085,769 |
| Net Cash Gain (Loss) | $1,973,966 |
| Unpaid Obligations | $0[27] |

---

[27] Other than wages and benefits, the Debtors are deferring paying amounts due to insiders in the ordinary course of the Debtors' business until the effective date of the Plan.